Argued June 7, reversed and remanded September 26, petition
for rehearing denied November 13, 1962

# NIELSEN v. BROWN

374 P. 2d 896

*H. H. Phillips,* Portland, argued the cause for appellant. On the briefs were Phillips, Coughlin, Buell & Phillips.

*Lewis Hoffman,* Eugene, and *James J. Duryea,* San Francisco, California, argued the cause for respondent. With them on the brief were Bailey, Hoffman & Spencer, Eugene.

Before McAllister, Chief Justice, and Rossman, Perry, Goodwin and Lusk, Justices.

LUSK, J.

This is a personal injury action based on charges of gross negligence in the operation of an automobile by the defendant Beverly Elizabeth Brown. Two other defendants, sued as owners of the automobile, were exonerated on the trial. The jury returned a verdict for the plaintiff against Beverly Elizabeth Brown (hereinafter referred to as the defendant) for $32,255 and from the consequent judgment she has appealed.

Plaintiff and defendant were high school students at the time of the accident out of which the action arose. Plaintiff was a passenger in the car driven by

the defendant. The evidence shows that the defendant attempted to make a left hand turn while driving at an excessive rate of speed—90 miles per hour according to some of the testimony—and that the car overturned. Plaintiff sustained serious injuries. She was badly burned by gasoline from the car and keloid scars on her breasts and other parts of her body remain which probably cannot successfully be treated by plastic surgery.

For error in the reception of evidence, to be later considered, we have concluded that the judgment must be reversed. In view, however, of a new trial, it is necessary to pass upon other assignments of error. One of these, involving an important question of evidence, is directed to the ruling of the trial judge which permitted Dr. Reinhold Kanzler, a plastic surgeon, to testify concerning the plaintiff's injuries as a witness for the plaintiff. Defendant objected on the ground that Dr. Kanzler had been retained by her to examine the plaintiff in preparation for the trial.

The record shows that during the presentation of plaintiff's case in chief counsel for the defendant, Mr. James K. Buell, in chambers stated to the court that he assumed that Dr. Kanzler would be called as a witness by the plaintiff because he had been served with a subpoena by her, and moved "that any attempt on the part of the plaintiff or her attorney to call Dr. Kanzler as a witness be suppressed and that the Court instruct counsel not to do so." The ground of the motion was "that the examination of the doctor at my request and the findings and conclusions that he made is part of the work of the lawyer in the preparation of a case for the trial and is confidential and they are not entitled to go into it, and I detect in the proposed procedure, a manner of pettifogging

around the edges of this case to attempt to smear me and smear my clients and smear the doctor and an attempt on the part of the plaintiff to bolster up or distract the attention of the jury from the testimony of their own attending physician yesterday."

The judge ruled that he would allow the plaintiff to call Dr. Kanzler "as a witness concerning his examination made of the plaintiff." The ruling is assigned as error.

Dr. Kanzler thereafter took the stand as a witness for the plaintiff and testified at length as to his findings based upon his examination of the plaintiff and gave his opinion that it would be hazardous to attempt to remove the scars. In general, he confirmed the opinion expressed by a physician previously called as a witness by the plaintiff and no doubt brought added weight to that opinion because plastic surgery is Dr. Kanzler's specialty.

■ It is to be observed at the outset that the procedure of attempting to "suppress" the testimony of a witness in advance of his being called to the stand is not one to be commended. The judge is not required to make a ruling until objection is interposed to a question asked. Inasmuch, however, as the judge did rule, albeit on what was at the time a hypothetical rather than an actual state of affairs, and everyone concerned seems to have treated the matter as though the question sought to be raised is properly here on its merits, we shall so consider it.

The specific grounds of objection stated by counsel were that the evidence expected to be elicited was "part of the work of the lawyer in preparation of a case for the trial" and was "confidential" and that the proposed procedure was an attempt to "smear"

the attorney for the defendant and his clients and the doctor, etc.

■ In support of the second ground it is argued that communications between Dr. Kanzler and the attorney for the defendant were privileged because of the existence of an attorney-client relationship. Our statute upon that subject reads:

"An attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon, in the course of professional employment." ORS 44.040 (b).

But no attorney-client relationship existed here. The plaintiff was not Mr. Buell's client and Dr. Kanzler was not a client, but an agent, of the defendant. The cases relied on by the defendant are not in point. In *Brink et ux v. Multnomah County*, 224 Or 507, 356 P2d 536, we held that a report made by an appraiser employed by the county as part of the preparation for the trial of a condemnation action was privileged and properly excluded when offered in evidence by the property owner. The deputy district attorney in objecting to admission of the report stated that Kolberg, the appraiser, had been employed by the county "to observe this property in question and to act as a consultant and advisor to me as Deputy District Attorney representing Multnomah County and in that respect has communicated with me in regard to certain data relative to this problem." The court said:

"A communication made under the circumstances described by defendant's counsel would fall within the privilege extended to a client for communications with his lawyer. A communication 'by *any form of agency* employed or set in motion by the client is within the privilege.' 8 Wigmore, Evi-

dence § 2317, p 616 (3d ed 1940) ; City and County of San Francisco v. Superior Court, 37 Cal2d 227, 231 P2d 26, 31, 25 ALR2d 1418 (1951). * * *" 224 Or at 516-517.

*City and County of San Francisco v. Superior Court,* supra, cited by the court in the *Brink* case and relied on by the defendant, held that a physician employed by the plaintiff in a personal injury case to examine the plaintiff in order to aid the latter's attorneys in the preparation of the case for trial could not be compelled to answer questions as a witness for the defendant regarding his examination of the plaintiff. To admit the testimony, it was held, would be to violate the rule against disclosing communications between attorney and client. The privilege, it was said, "embraces not only oral or written statements but actions, signs, or other means of communicating information by a client to his attorney." It will be noticed that the communications in this case were between the attorney and his client through the intermediary, the physician, not, as here, between the attorney and his adversary's client. The distinction is pointed out in *Grand Lake Drive In v. Superior Court,* 179 Cal App 2d 122, 125, 3 Cal Rptr 621, 625, and in *Jorgensen v. Superior Court,* 163 Cal App 2d 513, 329 P2d 550, where it was held that the plaintiff in a personal injury action who had voluntarily submitted to a physical examination at the request of the defendant, was entitled to a copy of the doctor's report. Similar cases relied on by the defendant are distinguishable for the same reason: *Wilson v. Superior Court,* 148 Cal App 2d 433, 307 P2d 37[1] (expert emloyed by the defend-

---

[1] The decision in this case appears to be questioned in Grand Lake Drive In v. Superior Court, supra, on the ground that the elements of communication and confidentiality were not present and that what was said with reference thereto was dictum.

ant in an action for damage to plaintiff's land to investigate the cause of a slide and to make a report) ; *State v. Hunt,* 25 NJ 514, 138 A2d 1; *State v. Kociolek,* 23 NJ 400, 129 A2d 417 (the last two cited cases were first degree murder cases in which attorneys for the defendants had their clients examined by a psychiatrist). In all these cases the courts turned back the efforts of opposing parties to call the experts as witnesses and to compel them to disclose the results of their investigation and examinations.

Whatever communications there may have been between Dr. Kanzler and the attorney for the defendant as the result of the former's examination of the plaintiff and concerning which he was permitted to testify, they did not originate with a client of the attorney but with the plaintiff, and the facts, therefore, do not bring the case within the attorney-client privilege.

The defendant's main contention is that admission of the testimony violated the rule protecting the so-called "work product of the lawyer," a phrase which appears to have first gained currency through the opinion of Judge Goodrich in *Hickman v. Taylor,* 153 F2d 212, 223 (3d Cir. 1945), aff 329 US 495, 67 S Ct 385, 91 L ed 451. This court has never heretofore had occasion to consider the question of the existence of the boundaries of this rule except in the *Brink* case, where it was said that the plaintiffs' demand for the information contained in the expert's report might possibly have been resisted by defendant's counsel on the ground that it was a part of his "work-product" arising out of his preparation for trial, but as there were other adequate grounds for decision, it was deemed unnecessary to determine whether the rule was applicable.

The *Hickman* case (the leading case on this question) arose under the discovery provisions of the Federal Rules of Civil Procedure, Rules 26, 33, 34, 28 USCA, following section 723 c. This was an action for wrongful death brought under the Jones Act. The court held that the attorney for the defendant could not, in the absence of a showing of necessity therefor, be compelled to answer an interrogatory as to whether he had taken statements from certain witnesses and to attach exact copies of such statements to the interrogatories.[®] The decision is analyzed in 4 Moore's Federal Practice (2d ed) 1119 et seq., and its meaning and application, as exemplified in subsequent decisions of the lower Federal courts, is discussed at pages 1141-1149. Although concerned with discovery procedure under the Federal system, the case is not for that reason, as suggested in plaintiff's brief, to be cast aside as irrelevant. "The [Federal] Rules probably go further than any State practice, but they are a much greater distance from the practice in some States than in others." *Hickman v. Taylor,* supra, 153 F2d at 217. They are undoubtedly a great distance from the practice in Oregon. Among Oregon lawyers, whether they are or are not an unmixed blessing seems to depend upon the point of view. It will not be denied, however, that "the Rules are intended to go far in making information known by one party available to the other." Id. The *Hickman* case places a limitation upon the right of discovery and the decision, and the reasoning in support of it, are not to be brushed aside because we are dealing here, not with discovery, but

---

[®] It was also held that a demand that the attorney detail the provisions of oral statements need not be complied with and that no showing of necessity justifying the demand could be made.

with testimony at the trial. The basis of the privilege, as stated by Mr. Justice Murphy for the Supreme Court in the *Hickman* case,[9] has application to both situations when the nature of the information sought to be obtained is of the same kind. See McCormick on Evidence, Hornbook Series, 202-203.

But, as the language in the footnote quoted sufficiently indicates, this case does not involve the work product rule. The Circuit Court of Appeals said in the *Hickman* case, 153 F2d at 223, "* * * here we are dealing with intangible things, the results of the lawyer's use of his tongue, his pen, and his head, for his client. This was talked about as the 'work product of the lawyer' in the argument of the case." In the well-reasoned opinion of Draper, J., in *Grand Lake Drive In v. Superior Court,* supra, the court said, referring to the *Hickman* case: "There the material

---

[9] "Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways —aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." 329 US at 510-511.

sought was wholly from the files of the attorney, all the product of his effort, research, and thought." 179 Cal App 2d at 129. And so the court held in that case that an engineer who, at the request of the attorney for the defendant in a personal injury case, made an inspection and tests of the premises involved, would be required under the California civil discovery procedures (which are patterned after the Federal rules) to testify in a pretrial deposition as to his observations and his conclusions as an expert witness from the making of such tests. The court said:

> "In our case it is the thought, research and effort of Cheek [the witness] which is sought by plaintiff. Although defense counsel may have exercised ingenuity in determining that 'slipperiness' of the walk could be tested, this is not enough, as we read Hickman, to make the examination and tests of Cheek the work product of counsel." Idem.

And in *Gordon v. Pennsylvania R. Co.*, 5 FRD 510 (DC ED Pa. 1946), where the plaintiff in a personal injury action moved for the production of copies of the reports to the defendant company of two physicians employed by the defendant to examine the plaintiff, the court ruled that the concept of the work product of the lawyer "is not capable of being extended to include the work product of a physician."

We are not required to determine in this case whether on the trial a party may compel his adversary to produce the report of an expert employed by the latter. The question here is whether the expert can be called as a witness by the party who did not employ him and compelled to testify concerning his investigation, examination, etc., and express his opinion on a question within his professional knowledge.

Neither the *Hickman* case nor any other that we have seen is authority for the proposition that the information and knowledge in the mind of the expert must be kept there and away from the jury on the theory that they are the work product of the lawyer.

There are decisions, however, which exclude the testimony on the ground of "unfairness". The doctrine of these cases was alluded to in *Brink et ux v. Multnomah County,* supra. There, in answer to the plaintiffs' contention that they were deprived of a fair and impartial trial by the exclusion of the testimony of the witness Kolberg, we said:

"* * * Despite the fact that Kolberg had informed plaintiffs and the court that he had not made an appraisal sufficient to warrant further testimony by him, still plaintiffs wanted to build their own case by forcing defendant's agent, Kolberg, to testify that he had assessed the property at a figure greater than the value for which defendant contends, and by creating an inference unfavorable to defendant by calling attention to its failure to call Kolberg after employing him to examine the property. Other courts have had occasion to reflect upon the practice of attempting to prove one's case by forcing the testimony of the expert retained by the opposing party. It has been said that one litigant should not be permitted to 'make use of his opponent's preparation of his case,' and that to do so 'would penalize the diligent and place a premium on laziness.' McCarthy v. Palmer, 29 F Supp 585, 586 (D.C.E.D. NY 1939), affirmed 113 F2d 721 (1940). See also, Lewis v. United Air Lines Transport Corporation, 32 F Supp 21, 23 (D.C. W.D. Pa 1940)." 224 Or at 519-520.

The language quoted from *McCarthy v. Palmer* was used in connection with a discussion of the extent to which the rules of Federal procedure permit the ex-

amination by one party of affidavits and similar materials secured by the other party by independent investigation incident to the preparation of the case for trial. It may be observed that the philosophy of those observations seems to have been disapproved, at least by implication, in two opinions of United States Courts of Appeals.[④] However that may be, what this court said in the *Brink* case on this subject amounts to no more than a holding that in the particular circumstances of that case, including the privileged character of Kolberg's report and the use intended to be made of it by the plaintiffs, the claim of deprivation of a right to a fair trial was without foundation.

The subject is discussed in 4 Moore's Federal Practice (2d ed) paragraph 26.24, where the author says at page 1157:

> "Litigants commonly pay experts substantial fees for obtaining their advice, and it is oppressive and unjust to permit a party to take advantage of his opponent by obtaining his expert witness' opinion, before trial, without paying any part of the cost thereof."

Federal decisions denying discovery on this ground are *Boynton v. R. J. Reynolds Tobacco Co.*, 36 F Supp 593, 595 (D Mass. 1941); *Lewis v. United Air Lines Transport Corporation*, 32 F Supp 21 (WD Pa. 1940); *Roberson v. Graham Corp.*, 14 FRD 83 (D Mass. 1952); *Dipson Theatres v. Buffalo Theatres*, 8 FRD 313 (WD

---

[④] "Some lawyers also grumble, saying that it is 'unfair' that a lawyer who has diligently prepared his case should be obliged to let counsel for the adversary scrutinize his data." Hoffman v. Palmer, 129 F2d 976, 997 (2d Cir. 1942) aff 318 US 109, 63 S Ct 477, 87 L ed 645, 144 ALR 719.

"Nor do we balk at the notion that the hare may by discovery avail himself of the diligence of the tortoise." Hickman v. Taylor, supra, 153 F2d at 219.

NY 1948); *Moran v. Pittsburgh-Des Moines Steel Co.,* 6 FRD 594 (WD Pa. 1947). Contra, *Sachs v. Aluminum Co. of America,* 167 F2d 570 (6th Cir. 1948): "The primary concern of courts of justice is to elicit truth essential to correct adjudication."

A few state courts have approved exclusion of such testimony at the trial in the discretion of the trial judge. *Ramacorti v. Boston Redevelopment Authority,* 341 Mass 377, 170 NE2d 323; *Cooper v. Housing Authority,* 197 Va 653, 90 SE2d 788; *L'Etoile v. Director of Public Works* (R I) 153 A2d 173, 77 ALR2d 1174. The Supreme Court of Washington, however, ruled otherwise in *Sneddon v. Edwards, Jr.,* 53 Wash 2d 820, 335 P2d 587, where it was held that the trial judge was in error in refusing to permit the expert, an engineer, to testify "apparently on the ground that, since respondents had paid him for making his investigation, they were privileged to keep him from testifying."

Putting to one side the fact that testimony which could properly be admitted at the trial might be excluded in a discovery proceeding (Moore op. cit. p 1157), none of the cases above cited, either state or federal, present the precise question with which we are faced here, namely, whether in a personal injury action a physician employed and compensated by the defendant to examine the plaintiff as a part of the defendant's preparation for trial can be prevented by the defendant from testifying on the trial as a witness for the plaintiff to an opinion already formed as the result of such examination. In such a case Rule 35 of the Federal Rules of Civil Procedure gives the person examined the right to be furnished with a copy

440

of the physician's report if he requests it and recognizes his right to take the deposition of the examiner.[9]

■ In Rogers on Expert Testimony (3d ed) the author says at page 797:

"Where a person voluntarily submits to a physical examination by a physician at the instance of the adverse party he may call the latter as a witness and interrogate him relative to the examination. * * *"

This statement was included in a discussion of the question whether an expert could be compelled to testify to an opinion without payment of compensation other than the ordinary witness fee. The law in this state is that, while the expert may not be required to

[9] Rule 35. Physical and Mental Examination of Persons

(a) Order for Examination. In an action in which the mental or physical condition of a party is in controversy, the court in which the action is pending may order him to submit to a physical or mental examination by a physician. The order may be made only on motion for good cause shown and upon notice to the party to be examined and to all other parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

(b) Report of Findings.

(1) If requested by the person examined, the party causing the examination to be made shall deliver to him a copy of a detailed written report of the examining physician setting out his findings and conclusions. After such request and delivery the party causing the examination to be made shall be entitled upon request to receive from the party examined a like report of any examination previously or thereafter made, of the same mental or physical condition. If the party examined refuses to deliver such report the court on motion and notice may make an order requiring delivery on such terms as are just, and if a physician fails or refuses to make such a report the court may exclude his testimony if offered at the trial.

(2) By requesting and obtaining a report of the examination so ordered or by taking the deposition of the examiner, the party examined waives any privilege he may have in that action or any other involving the same controversy, regarding the testimony of every other person who has examined or may thereafter examine him in respect of the same mental or physical condition.

make an investigation, he may be compelled to testify to an opinion already formed without the payment of extra compensation. *Mount v. Welsh et al.,* 118 Or 568, 585, 247 P 815. See, also, Rogers op. cit. § 318; 8 Wigmore, Evidence § 2203 (McNaughton rev. 1961); *State ex rel. Berge v. Superior Court,* 154 Wash 144, 281 P 335. We have no such question here as Dr. Kanzler was entirely willing to testify.

In *Osborn v. Seattle,* 142 Wash 25, 252 P 164, the plaintiffs in three personal injury actions submitted to examinations by a doctor retained by the defendant. Upon the trial the plaintiffs called the doctor as a witness for the purpose of having him testify as to these examinations. Objection on the ground that the information was confidential was overruled. The Supreme Court affirmed. The court said:

> "No case has been cited, and we know of no authority, which would sustain a holding that a person who voluntarily submits to an examination by a doctor, even though the examination was made at the instance of the adverse party, may not call that doctor as a witness upon the trial and interrogate him relative to the examination. This case is entirely different from that of seeking by interrogatories to get possession of the report which the doctor may have made to the person employing him. When the respondents voluntarily submitted to the examination, it naturally would be upon the implied assumption that they might call the doctor as a witness upon the trial, if they saw fit to do so. To suppress such evidence, in many cases would keep out of the trial facts which the court or the jury should know in order that a just determination of the cause might be had. Reason at least supports the right of the respondents to call the doctor in the present case and take his testimony

relative to the examinations which he made." 142 Wash at 30.

The question was again considered by the Washington court in *State ex rel. Berge v. Superior Court,* supra. This was a contempt proceeding arising out of a doctor's refusal to answer questions in a personal injury action upon the taking of his deposition. The question was stated to be "whether a person who voluntarily submits to an examination by a doctor at the instance of the adverse party may call the doctor as a witness and interrogate him not only as to the facts which he discovered upon the examination, but also as to his opinion as to the nature and extent of the injury, without compensation other than the ordinary witness fees." The court answered the question in the affirmative. After quoting from *Osborn v. Seattle,* supra, the court said:

"In that case, the question was whether the doctor could be required to testify as to the facts which he had discovered upon the examination. In the present case, it is sought to go a step further and inquire, not only as to the facts, but as to the opinion of the doctor as to the nature and extent of the injury. We see no reason why the same rule should not apply as to the doctor's opinion as is applied to the facts which were discovered by his examination. The opinion would be based upon the facts disclosed by the examination to which the adverse party to the one employing the doctor voluntarily submitted. This is not a case where the adverse party seeks to call a witness employed by the other party and interrogate him as to matters which require special preparation without the party calling him having in any manner cooperated. * * *" 154 Wash at 147-148.

We have found no other authorities bearing directly upon the question.

■■ In *Carnine v. Tibbetts,* 158 Or 21, 74 P2d 974, we held that the circuit court has inherent power to order a physical examination of the plaintiff in a personal injury action upon the motion of the defendant. See, also, *Moe v. Alsop,* 189 Or 59, 68, 216 P2d 686. In the *Carnine* case we said that the order should provide that the expense of such examination be borne by the party requesting it. 158 Or at 34. We see no reason why the court should not order also that a copy of the doctor's report of his examination be furnished to the plaintiff, as the Federal rules require. A California statute has a similar provision, Code of Civil Procedure, § 2032. See *Jorgensen v. Superior Court,* supra. During the argument upon the admissibility of Dr. Kanzler's testimony in the circuit court one of the attorneys for the plaintiff stated that this is the practice in some of the Oregon counties. The statement is in accordance with our understanding. After all, it is the plaintiff himself who is required to furnish the evidence by submitting to the examination and answering legitimate questions of the doctor which will aid him in forming his opinion. In *Carnine v. Tibbetts,* 158 Or at 30, we quoted with approval from 3 Jones, Commentaries on Evidence (2d ed) 1385, a summarization of the rules governing the physical examination of a plaintiff in a personal injury case. Among other things, the author says that the examination should be ordered "whenever it fairly appears that the ends of justice require the disclosure or ascertainment of important facts which can only be disclosed, ascertained and fully elucidated by such an examination * * *." We do not think that this disclosure is intended to be a one way street. It should not be solely for the benefit of the defendant to be made use of if it turns out to be for his advantage,

but suppressed if favorable to the plaintiff. If there be an element of unfairness in permitting the plaintiff to examine the doctor as a witness on the trial because the defendant paid him, there is a competing element of unfairness against the plaintiff without whose submission to a physical examination the evidence could not have been obtained. On balance, we think that the problem should be resolved by letting the evidence in, no matter at whose instance or whom it hurts, as an aid in the "search for truth and justice." *State of Oregon v. Cahill,* 208 Or 538, 582, 293 P2d 169, 298 P2d 214, cert den 352 US 895, 77 S Ct 132, 1 LE2d 87.

No order of the circuit court for a physical examination of the plaintiff appears to have been sought or obtained by the defendant. We assume, therefore, that the examination was acceded to by the plaintiff upon the mere request of the defendant, as is not uncommonly done in this class of cases. If this be so, then we agree with the Supreme Court of Washington that the plaintiff's voluntary submission to the examination was "upon the implied assumption that * * * [she] might call the doctor as a witness upon the trial if * * * [she] saw fit to do so." *Osborn v. Seattle,* supra.

In either case, whether submission to examination be the voluntary act of the plaintiff or upon order of the court, we hold that the mere fact that the doctor is compensated for his services by the defendant does not suffice to make him unavailable as a witness for the plaintiff.

We are not called upon to express an opinion as to the correct rule when the testimony involved is that of an expert employed by a litigant to appraise real property, make a chemical test, investigate an engineering problem, or the like. It is sufficient to say

that the ruling of the trial judge in this case, for the reasons we have stated, was not erroneous.

The defendant assigns as error the refusal of the court to give the following requested instruction:

"It is undisputed that at the time of the happening of the accident involved in this case, April 30, 1956, the defendant Beverly Brown was a minor child of the age of 16 years. In a case such as this a minor child is not held to or required to exercise the same degree of care and caution and foresight as would be required of an adult. On the contrary, in determining whether or not the defendant Beverly Brown was guilty of gross negligence or wilful and wanton misconduct, you are to consider her conduct at the time of and immediately prior to the happening of this accident in light of what would be expected of a reasonably prudent child of the same intelligence, background, education and maturity."

■ It is a general rule that a child is not required to conform to the standard of behavior which it is reasonable to expect of an adult, but his conduct is to be judged by the standard of behavior to be expected from a child of like age, intelligence and experience. This rule has been applied by this court in cases where the child is a plaintiff and is charged with contributory negligence, see *Pocholec v. Giustina et al,* 224 Or 245, 355 P2d 1104 (1960); *Maker v. Wellin,* 214 Or 332, 327 P2d 793, 329 P2d 1114 (1958); but we have never had occasion to consider whether it applies when the child is a defendant charged with what is sometimes called primary negligence.[®] On this question

---

[®] In Honeywell, Admx. v. Turner et al, 214 Or 700, 332 P2d 638 (1958), we held that the evidence was sufficient to warrant a finding that the defendant, a sixteen-year-old girl was guilty of gross negligence in the operation of an automobile. The trial

there is some disagreement among the authorities. Prosser on Torts (2d ed) 127, 128; Bohlen, Liability in Torts of Infants and Insane Persons, 23 Mich L Rev 9, 17; note, 38 Or L Rev 268. For present purposes it may be assumed that it is immaterial whether the child is plaintiff or defendant. For reasons now to be stated we think that this case presents an exception to the general rule.

In 1959 the American Law Institute adopted § 283A of the Restatement of Torts, which reads:

"If the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable person of like age, intelligence and experience under like circumstances." Restatement of the Law, Second, Torts, Tentative Draft No. 4, p 18.

Comment c to this section reads:

"*c. Child engaging in adult activity.* An exception to the rule stated in this Section may arise where the child engages in an activity which is normally undertaken only by adults, and for which adult qualifications are required. As in the case of one entering upon a professional activity which requires special skill (see § 299A), he may be held to the standard of adult skill, knowledge and competence, and no allowance may be made for his immaturity. Thus, for example, if a boy of fourteen

---

was before the court without a jury. The question of the standard of care to be observed by an infant was apparently not raised, though the opinion indicates that the age of the driver was not deemed a controlling factor. Thus the court said, 214 Or at 705:
"We cannot say that to drive a car of the age indicated at a speed approaching 60 miles per hour over a road of the character described is not some evidence of gross negligence. It could not be said that such conduct, admitted to have extended over a mile of driving upon such a road, was inadvertent. The course set upon was deliberate and intended. The hazards entailed would be clear to *any person of reasonable prudence.*" (Italics added.)

were to attempt to fly an airplane, his age and inexperience would not excuse him from liability for flying it in a negligent manner. The same may be true where the child drives an automobile. In this connection licensing statutes, and the examinations given to drivers, may be important in determining the qualifications required; but even if the child succeeds in obtaining a license he may thereafter be required to meet the standard established primarily for asults (sic)." Id. p 19.

Apparent approval was given to comment c in *Wittmeier v. Post,* 78 SD 520, 105 NW2d 65 (1960), though the court refused to apply it to that case which involved a charge of "wilful and wanton misconduct" in the operation of an automobile by a fifteen-year-old boy. The court, in passing on the question of the sufficiency of the evidence stated that an immature youth charged with willful and wanton misconduct "simply does not have, and cannot be expected to have, the skill, judgment, and conscious realization of the probable consequences of his actions that a more mature and experienced driver would, or should have."

In *Dellwo v. Pearson,* 259 Minn 452, 107 NW2d 859 (1961) the court held that a twelve-year-old boy, charged with negligence in the operation of a motorboat, should be held to the same standard of care as an adult. The reasoning of the court was as follows:

"To give legal sanction to the operation of automobiles by teen-agers with less than ordinary care for the safety of others is impractical today, to say the least. We may take judicial notice of the hazards of automobile traffic, the frequency of accidents, the often catastrophic results of accidents, and the fact that immature individuals are no less prone to accidents than adults. While minors are entitled to be judged by standards com-

mensurate with age, experience, and wisdom when engaged in activities appropriate to their age, experience, and wisdom, it would be unfair to the public to permit a minor in the operation of a motor vehicle to observe any other standards of care and conduct than those expected of all others. A person observing children at play with toys, throwing balls, operating tricycles or velocipedes, or engaged in other childhood activities may anticipate conduct that does not reach an adult standard of care or prudence. However, one cannot know whether the operator of an approaching automobile, airplane, or powerboat is a minor or an adult, and usually cannot protect himself against youthful imprudence even if warned. Accordingly, we hold that in the operation of an automobile, airplane, or powerboat, a minor is to be held to the same standard of care as an adult." 259 Minn at 458.

The court referred to the Restatement comment quoted above, but left open the question whether it should adopt the "broader rule that would hold a child to adult standards whenever he engages 'in an activity which is normally undertaken only by adults, and for which adult qualifications are required.'" The court concluded:

"For the present it is sufficient to say that no reasonable grounds for differentiating between automobiles, airplanes, and powerboats appears, and that a rule requiring a single standard of care in the operation of such vehicles, regardless of the age of the operator, appears to us to be required by the circumstances of contemporary life." Id. at 459.

A similar view was suggested in a dictum of this court in *Simmons v. Holm et al,* 229 Or 373, 367 P2d 368 (1961). One of the questions in that case was whether the plaintiff, a boy fourteen years of age,

who was injured while riding his bicycle, was guilty of negligence per se. We held that the rule that violation of a statute is negligence per se should not be applied to children, but added this caveat:

"This opinion is not to be construed as holding that a minor may not under other and different conditions be held liable for negligence per se. If evidence demonstrates that a minor, in view of his advanced age, education and experience, should be held subject to the standard of reasonable care applicable to adults, then it may also be true that his violation of a statute would constitute negligence per se. An illustration might be that of a minor licensed by the state to drive an automobile, who runs through a red light. Such a situation is not before us in this case, and we express no opinion upon it." 229 Or at 396-397.

See *Karr v. McNeil,* 92 Ohio App 458, 110 NE2d 714 (1952), (19 year old boy driving automobile held guilty of negligence per se for violating traffic signal ordinances and statutes.)

So it was said arguendo in *Nelson v. Arrowhead Freight Lines,* 99 Utah 129, 104 P2d 225 (1940):

"* * * Certainly the policy of the state has not been one indicating that persons of these ages [i.e., 16½ years] are not to be held to the same degree of care in the operation of motor vehicles as persons who have attained their majority. The statute permits persons sixteen years of age to drive and operate passenger automobiles upon the highways. Rev. St. 1933, 57-10-1. This authorization must proceed upon the assumption that in the absence of some demonstrated infirmity, not presumed to exist in persons sixteen years of age, such a person is presumed to possess that discretion and physical capacity consistent with the safe use of the highways, and as setting an age at and

above which the presumption of adult responsibility attaches. * * *" 99 Utah at 134.

In *Wilson v. Shumate,* 296 SW2d 72 (1956, Mo) the court refused to apply the general rule respecting the standard of care for children to a seventeen-year-old girl charged with negligence in the operation of an automobile because of the provision of a statute that "Every person operating a motor vehicle on the highways of this state shall drive the same in a careful and prudent manner, and shall exercise the highest degree of care * * *."

It may readily be acknowledged that there are decisions contrary to the views expressed in the Restatement and in *Dellwo v. Pearson,* supra. In *Charbonneau v. MacRury,* 84 NH 501, 153 A 457, 73 ALR 1266 (1931), the court rejected the contention that because the statute authorized the granting of licenses to operate automobiles to minors of the age of 16 years and over a minor so licensed should be held to the same standard of care as an adult. The court reasoned that the legislature had not by the enactment of the statute undertaken to deal with the rule of care. *Hill Transp. Co. v. Everett,* 145 F2d 746 (1st Cir. 1944), held that the rule of this case was inapplicable where an employer was sought to be charged vicariously for his minor servant's negligence. *Harvey v. Cole,* 159 Kan 239, 153 P2d 916 (1944), adopted the reasoning of the *Charbonneau* case where the question was upon the contributory negligence of a seventeen-year-old boy driving a motor vehicle. Other cases in which it has been held that "teenagers" driving automobiles are not required to observe the standard of care of an adult are *Overlock v. Ruedemann,* 147 Conn 649, 165 A2d 335 (1960) ; *Sheets v. Pendergrast,* 106 NW2d

1 (1960 ND); *Chernotik v. Schrank,* 76 SD 374, 79 NW2d 4 (1956). In none of the opinions in these cases, however, was express consideration given to the problem presented by the fact that the activity, although engaged in by a minor, was normally that of an adult or to other factors referred to by the Minnesota court in its opinion and deemed by that court of controlling importance.

To adopt the suggested rule of the Restatement so far, at least, as the operation of automobiles by minors is concerned, may be an innovation on the law of Oregon, but if so it is one that is justified by "the circumstances of contemporary life", *Dellwo v. Pearson,* supra. We may agree that, as the new Hampshire court said in the *Charbonneau* case in respect to their statute, when the legislature of this state provided that a license to operate an automobile shall not be issued to any person under the age of 16 years, ORS 482.110, it did not undertake to deal with the rule of care. Nevertheless, we think that the statute could have been enacted only upon the assumption that it is reasonably consistent with the public safety to permit children 16 years of age and over to drive automobiles upon the public highways. In this respect no distinction has been made between children covered by the statute and adults. This being the policy implicit in the law, we think it to be not only logical but salutary to judge the behavior of children in a case of this kind by the same standard that is applied to adults. And we see no reason for a different rule where the question is not merely one of ordinary negligence, but of gross negligence or reckless driving.

■ At the time of the accident out of which this case arose the defendant was nearly 17 years of age. There is nothing to suggest that she was not an entirely

normal person physically and mentally. She had previously driven for a year under a learner's permit, as provided by ORS 482.170, and for nearly a year under an operator's license. It is our view that when she assumed the responsibility of driving an automobile pursuant to a license issued by the state, she put off the things of a child for the purpose of that activity and should be held accountable for injury to another caused by departure from standards expected to be observed by persons of mature years.

■ The defendant assigns as error the refusal of the court to give the following requested instruction relative to gross negligence:

"Gross negligence within the meaning of the Oregon Statute limiting the right of a gratuitous passenger to recover damages from host-driver of the automobile in which he or she was riding to cases where the driver was guilty of gross negligence, wilful and wanton misconduct or intoxication is only such conduct as a jury can reasonably find to be 'in reckless disregard of the safety of the plaintiff' which not only creates an unreasonable risk of bodily harm to the plaintiff but also involved a high degree of probability that substantial harm would result to plaintiff.

"You could not find the defendants in this case guilty of gross negligence or wilful or wanton misconduct unless you find that under all the circumstances of this case the conduct of the defendant Beverly Elizabeth Brown in the operation of her automobile indicated a reckless state of mind and an indifference to the probable consequences of her conduct to the extent you could fairly find that she evidenced an 'I don't care what happens' attitude."

The instruction given by the court was as follows:

"I will now attempt to define to you what constitutes gross negligence and reckless disregard of

the rights of others. The actor's conduct is, in gross negligence, and reckless disregard of the safety of another, if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing, or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him. Now, necessarily, gross negligence and reckless disregard of the rights of others is substantially and appreciably higher in magnitude than ordinary negligence. It is naturally more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty as distinguished from a mere failure to exercise ordinary care. The element of culpability which in common law in gross negligence or reckless disregard of the rights of others, must be magnified to a higher degree as compared with that in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence."

Defendant took exception as follows:

"We request an exception to the modification of our requested instruction Number 2, in that the Court did not cover the last paragraph thereof, which contained our theory of the law that the plaintiff was required to prove a reckless state of mind and indifference to the consequences of her conduct, and the 'I don't care what happens' attitude."

Defendant relies on *Williamson v. McKenna,* 223 Or 366, 354 P2d 56. In that case, after holding that in determining questions of gross negligence and reckless indifference to the rights of others, an objective stand-

ard, as expressed in the Restatement, Torts § 500,[⑦] should be observed, it was said relative to instructions:

> "The common use of the expression 'I don't care attitude' in instructions to convey the idea of consciousness of risk is an example of the trial judges' artfulness in reaching the jurors' minds." 223 Or at 401.

This is far from saying that to refuse to use the quoted phrase is error. Indeed, it can be error so to instruct unless it is made clear to the jury at the same time that an objective, not a subjective, standard must be applied, as the case of *Taylor v. Lawrence,* 229 Or 259, 265, 366 P2d 735, illustrates. In this regard, the requested instruction is open to criticism, for it omits entirely the standard of a "reasonable man", which is an essential element of the rule of our decisions.

■ We are not to be taken as holding that actual consciousness of the risk may not be a "significant factor" in determining defendant's liability. The point is that such consciousness is not necessary to be proven in order to make a case of gross negligence or reckless disregard of the rights of others. *Williamson v. McKenna,* supra, 223 Or at 396-399. In the case at bar there was evidence from which the jury might have found an "I don't care attitude" on the part of the defendant, and, though the court was not required to do so it would have been proper for it to instruct in that language, not as a substitute for the instruction based on the Restatement rule, but as supplementing it.

---

[⑦] "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him."

The second sentence of the instruction given by the court, which is substantially in the language of the Restatement, is criticized as incomprehensible by a jury. No exception was taken on that ground, but since the case must be tried again we will take notice of the contention. The instruction is in almost the exact language of section 500 of the Restatement of Torts, but is grammatically defective. Section 500 opens with the words "The actor's conduct is in reckless disregard of the safety of another  * * *." The instruction combined gross negligence and reckless disregard in this phrase, so as to read: "The actor's conduct is, in gross negligence, and reckless disregard," etc. While it is good English to say that conduct is in reckless disregard of another's safety, we do not say that someone's conduct is *in* gross negligence, but that it is grossly negligent or constitutes gross negligence. We think that it would be better to give the rule of the Restatement to the jury verbatim, except as hereinafter modified, and to follow that with an instruction that gross negligence and reckless disregard of the safety of another mean the same thing.

■ This, however, is not the point of counsels' argument. They say that the language of the Restatement is lawyer's language and meaningless to a jury. There is perhaps room for this criticism, though we think that an instruction in the language of section 500 is quite as understandable as other instructions frequently given dealing with legal abstractions, as, for example, the classic definition of proximate cause. See *Miami Quarry Co. v. Seaborg Packing Co.,* 103 Or 362, 370, 204 P 492. Gross negligence or reckless disregard of the safety of others is a highly abstruse concept, the meaning of which is difficult to put into laymen's language. We think that section 500 is reason-

ably clear, but we suggest that since it is the defendant whose conduct is in question the judge should speak of the defendant or the "driver of the automobile" instead of "the actor". We think it well, also, to give the substance of comment c to section 500 as we pointed out in *Taylor v. Lawrence,* supra, 229 Or at 266.

■ The remainder of the instruction in which the court explained to the jury with some particularity the meaning of gross negligence and reckless disregard of the safety of others is also challenged. The substance of some of these definitions was approved in part by this court in *Storla v. S., P. & S. Trans. Co.,* 136 Or 315, 320, 321, 297 P 367, 298 P 1065. See, also, *Rauch v. Stecklein,* 142 Or 286, 290, 20 P2d 387. We think, however, that the following portions of the instruction should be omitted on another trial:

> "* * * It is an act or omission respecting legal duty as distinguished from a mere failure to exercise ordinary care. The element of culpability which in common law in gross negligence or reckless disregard of the rights of others, must be magnified to a higher degree as compared with that in ordinary negligence."

We do not believe that the foregoing sentences would be helpful to a jury. In fact, we are not sure that we understand them ourselves.

During the direct examination of the plaintiff the following occurred, as disclosed by the transcript of testimony:

> "Q (By James Duryea): Lynne, has your married life been a happy one?
>
> "MR. BUELL: If it please the Court, I don't think the question of whether the married life has or has not been happy is proper.

"THE COURT: I will sustain the objection.

"Q (By Mr. Duryea): Lynne, has the fact that you have the scars on the parts of the body that you have them affected your married life in relationship with your husband?

"MR. BUELL: Again, Your Honor, I think we are getting into something—there is no claim of this made in the complaint. I certainly will not . . . .

"MR. DURYEA: May I be heard?

"THE COURT: Just a moment. Let me look at the complaint. I will overrule your objection. You may ask the last question.

"MR. DURYEA: Will the reporter read the last question.

(Last question read aloud by reporter)

"THE WITNESS: A Yes.

"Q (By Mr. Duryea): Will you explain that, please?

"A I can't. (Witness broke down, sobbing)."

A recess was thereupon ordered and the judge and counsel adjourned to chambers, and in the course of a lengthy colloquy counsel for defendant moved that the last question and answer quoted above be stricken on the ground that damage based on interference with the marriage relation was not pleaded and was not compensable. The judge denied the motion and explained his position as follows:

"THE COURT: I don't think you really understand maybe what I said. In her complaint, she has here an allegation that there is a severe personality change as the result of the disfiguring scars and shock and it is impossible to make a normal adjustment to life. She is entitled to put on evidence which would not naturally flow from the injuries which she has received. I am going

to limit any testimony to these particular considerations. Now, I want you to understand that I am not opening the door to evidence concerning her marital life. I am saying if she can say that because of these scars it has had some effect, the fact that she may be embarrassed by reason of her breasts and that is what I am talking about.

"MR. HOFFMAN: The effect on her.

"THE COURT: I am not talking about her husband. He is no part of this case, and I want it understood that that is the only purpose I will allow any examination of her mental anguish, as the result flowing naturally from the injuries. Consequently, I will overrule your last motion. And I would anticipate that counsel will be careful in questioning the plaintiff to keep it within the limits which I have suggested. I will assume that you will make a continuing objection to any testimony along the lines that you have objected to."

Upon the resumption of the taking of testimony before the jury the following occurred:

"Q (By Mr. Duryea): Now, is this feeling that you have with reference to not wanting other people to see these scars extended to and does it include your husband?

"A Yes, it does.

"Q Now, what do you do to limit or prevent his seeing those scars and those damaged areas.

"A Well, I change clothes out of his presence and we work it out.

"Q Now, has that fact, because of the scars that exist on those parts of your body which requires your changing clothes or not being seen without covering of those particular parts presented cause for exchange of words or expressions of bad feeling by him?

"A Often.

"Q And has that expression of bad feeling progressively increased as your marriage continued?

"A Yes, it has."

In *Fehely v. Senders,* 170 Or 457, 461, 135 P2d 283, 145 ALR 1092, we said:

"It is established by the decisions of this court that one suffering from injuries to his person due to the negligence of another may recover for mental distress and anguish which directly and as a natural consequence flows from the physical injury whether present or fairly and reasonably to be apprehended. (Citing Oregon cases.)"

We held in the *Fehely* case that within this principle the apprehension of a pregnant woman that her child might be born dead or deformed as the result of an injury to her person was an element of damage. And in the course of the opinion we approved decisions of other courts which hold that damages are recoverable for humiliation, embarrassment, or mortification resulting from a scar or deformity produced by the defendant's act.

■ It was, therefore, competent for the plaintiff to testify to her embarrassment in the presence of her husband resulting from the scars on her body and her desire to conceal them from him. It was a quite different thing, however, to permit her to testify that as a further consequence her husband gave vent to expressions of "bad feelings" which "progressively increased" as the marriage continued. If it was not the purpose of counsel to show that an injury to the plaintiff caused by an automobile accident five years before had a disruptive effect upon a marriage subsequently contracted, that was certainly its natural effect. The judge had previously sustained an objection

to the question whether the plaintiff's married life had been a happy one and in the subsequent session in chambers had made it clear, and properly so, that he was "not opening the door to evidence concerning her marital life." Further, he expressed his confidence that "counsel will be careful in questioning the plaintiff to keep it within the limits which I have suggested." These were the permissible limits of inquiry into the question of the plaintiff's relationship with her husband. They were transgressed by the questions and answers to which we have specifically referred. The defendant was given a continuing objection to all this line of testimony and the admission of the evidence was reversible error.

We have discussed all the assignments of error except one which deals with a situation not likely to arise on another trial.

The judgment is reversed and the cause remanded for further proceedings in conformity with this opinion.