Gary K. COLEMAN, Infant, by his father and next friend, George W. Coleman, Appellant,

v.

John BAKER, d/b/a Baker Electric Company, Appellee.

Court of Appeals of Kentucky.

June 5, 1964.

Rehearing Denied Nov. 6, 1964.

Charles E. Lowe, Jack T. Page, Pikeville, for appellant.

F. M. Burke, J. A. Runyon, Pikeville, for appellee.

PALMORE, Judge.

The appellant, Gary Coleman, a 16-year old boy, was run over and injured by a 3000-lb. battery-powered mine motor while he was in a building used for the manufacture and assembly of such motors. He brought this suit for damages against the appellee, John Baker d/b/a Baker Electric Company, on the theory that the premises and manufacturing operation were under the management and control of Baker and that the accident resulted from the negligence of his employes. Appeal is taken from a judgment entered on a verdict directed in favor of defendant at the close of plaintiff's evidence.

The issues to be decided are:

1. Was there enough evidence of a master-servant relationship between Baker and the workmen on the premises to raise a jury question?

2. Was there enough evidence of negligence to raise a jury question?

3. Was Gary Coleman contributorily negligent (or, to put it another way, did he assume the risk) as a matter of law?

The evidence pertinent to the first question was substantially as follows:

The building in which the accident occurred was constructed by Baker in 1954 or 1955 on property owned by his father-in-law. Since that time it has been used by Baker as a machine shop to build mine motors and chargers, and the witnesses referred to it as the "Baker Electric Shop." Baker admitted that he had conducted the operation until 1960, but said that he put "some" of his men on an independent contractor basis on January 1, 1960, and the rest of them on June 1, 1960. The date of the accident was June 29, 1960, at which time he had subsisting contracts with at least two workmen, one of which, he said, had been reduced to writing and the other of which he was unable to get signed until July (though it was dated June 1). These two agreements, both dated June 1, one with Travis Coleman and the other with Junior Thacker, were introduced in evidence. The only other person he identified as having had such a contract, allegedly dated January 1, 1960, was the witness Columbus Hall, who had quit working for him prior to the accident. The Hall contract was not produced in evidence.

Under the terms of the form agreement Baker rented unspecified space in the shop to the individual workman for $1 per month. Baker was to furnish all parts necessary to the manufacture of mine motors and the workman was to build them and to pay all bills for electricity, acetylene and oxygen. For each completed unit Baker agreed to pay the workman $150 plus $25 as reimbursement for electricity expense. It was further provided that the workman would "be responsible for any damages caused by his workers and for any accidents they may have or that outside persons may have on or about the premises."

Baker testified that both he and the individual workmen procured and accepted orders for construction of the motors. He said that he visited the shop about once a week to see if they needed any parts. His home (and apparently his principal place of business) was in Grundy, Virginia, whereas the shop in which the accident took place was located in Pike County, Kentucky. The trial court erroneously sustained objection to a question as to whether he had any similar shops elsewhere, but no avowal was made, so we do not know the scope of

Baker's operations or what arrangements he had with other persons, if any, performing similar work for him.

Testimony that Baker made no social security or withholding tax deductions from payments made to the workmen was not contradicted. A series of checks from Baker to Junior Thacker showed dates and amounts as follows:

| June 10 | — | $80.90 |
| June 18 | — | 45.90 (with notation, $20.-00 advance on motor") |
| June 25 | — | 60.90 |
| July 2 | — | 45.90 |
| July 16 | — | 50.00 |

It will be noted that no combination of these figures bears any apparent relationship to $175, the "contract" price for each unit. Baker explained that he would advance each man about $50 per week and pay the balance due on completion of the motor then in process of manufacture. Travis Coleman, one of the men, attempted to explain that payments did not come out to an even $175 because they sometimes did "extra work." However, he admitted that this extra work was done on their own for persons other than Baker and that the money for it did not pass through Baker's hands. He admitted also that he did not pay any bills for electricity or acetylene, but that these expenses were paid by Baker and deducted from the contract payments.

Both Baker and Travis Coleman were confused with respect to the contents of the contract until a copy was produced for inspection. Baker at first said the rental amount was $1 yer year, and then said that $12 was paid in advance, whereas the agreement recites that only $1 was paid. Travis Coleman testified that the rental was $125 per year.

At the time of the accident a 15-year old boy named Gary Thacker was working on the premises in question, digging a ditch. He said he had also worked within the shop building cleaning up trash. He had been hired by Baker.

Under this evidence we are unable to say that the written contract introduced in evidence reflected the actual arrangement between Baker and the workmen or, if so, that it was conclusive of the question whether they were servants or independent contractors. The building was owned by Baker and the business was conducted under the name of Baker Electric Company. Until very shortly before the accident, unquestionably it was operated on a master-servant basis. That the method of payment was changed from salary to job rate (if, indeed, it was really changed) is not of dispositive significance. The ultimate test is the control reserved or exercised by the employer, and even if there is a written contract, actual practice under it may outweigh its provisions.[1] Cf. 53 A.L.R.2d 183, 185. If different inferences may reasonably by drawn with respect to the true relationship of the parties, a jury question is presented. 1 Restatement of Agency 2d § 220, comment c.; 56 C.J.S. Master and Servant § 13, p. 92; 35 Am.Jur. 1040 (Master and Servant, § 600). It is our opinion that it would not be unreasonable for a jury to conclude, on these facts, that there had been no real change in the relationship between Baker and the workmen prior to the accident. Hence the first question must be answered in the affirmative.

We turn now to the circumstances bearing on the issues of causation, negligence, and contributory negligence or assumed risk.

As may be gathered from what has been said thus far, the work at Baker Electric Shop was not a large operation. On the

[1] In this particular case the contract itself sheds very little light on the question of control. Hence even if its provisions had been rigidly followed, it could not, of itself, be determinative of the relationship as a matter of law.

afternoon of the accident the only workmen present were Travis Coleman, who was doing some welding in the building, and Gary Thacker, the boy digging a ditch on the outside. Gary Thacker's younger brother Larry, 13 years of age, also was present. The appellant, Gary Coleman, and a companion, Dean Coleman, also 16 years old, went to the shop for the purpose of riding the motors. They and other young boys in the neighborhood had theretofore been allowed to do this almost at will, both in and out of the building. Appellant testified that on at least one of the numerous occasions when he had been inside the shop (at which time, however, he was not on one of the machines) Baker was present and did not tell him to stay out. On the occasion of the accident Travis Coleman, the only grown man on the scene, says he told the boys that if they didn't stay off the machine in question they would get killed. Appellant denied this, but in any event it is clear that Travis Coleman went on about his work and made no attempt to prevent the operation of the machine. Appellant, who by reason of his previous experiences of the same nature in the same place had attained a proficiency in the handling of these motors, got on one of them and drove it in reverse to the end of the building, a distance of some 50 feet, and then forward to its starting position, where he stopped it. His description of the ensuing mishap is as follows:

A. "Well, I was driving this motor —I had backed up and then pulled it back up and stopped it and I was just sitting on it and it started out and when it went forward, I fell off—it started out real fast and I fell off backwards and it hit the concrete floor and knocked it in reverse and it come back over top of me before I could get out of the way."

Q. "You were sitting on the back before you was knocked off it?"

A. "Yes, sir."

Q. "Who started the motor going forward?"

A. "I think it was Larry Thacker. He was standing there beside of it."

Q. "Larry Thacker was the closest one to it?"

A. "Yes."

Q. "How old is Larry Thacker?"

A. "Thirteen."

Q. "Now, what kind of motor run over you, was it the four wheel or the three wheel?"

A. "Three wheel."

Q. "Whereabouts did it run over you or by you?"

A. "The back wheel crossed over my hips."

* * * * * . *

Q. "Now, you were sitting on it immediately before you were hurt?"

A. "Yes."

Q. "And it started in motion with such force or speed that it threw you off?"

A. "Yes."

Neither Larry Thacker nor Dean Coleman testified. Travis Coleman and Gary Thacker, the only others present besides the appellant, did not see the accident. Hence the only evidence conducing to show the cause was appellant's statement that he thinks Larry Thacker started the motor, because he was the closest person and was standing next to it. This evidence is thin, yet we think it is enough to justify an inference that the appellant himself did not start the machine and that Larry Thacker probably did.

██ Reasonable probability is all that is required of evidence in order to support a factual conclusion. 20 Am.Jur. 1099, 1101 (Evidence, §§ 1248, 1250). "Evidence rea-

sonably tending to prove the essential facts, either directly or indirectly, or by permissible inference, is sufficient to sustain a judgment. * * * And essential facts may be proved by circumstantial evidence in which event it is not necessary that proof rise to a degree of certainty which will exclude every other reasonable conclusion than the one reached by the jury." Cities Service Gas Company v. Eggers, 186 Okl. 466, 98 P.2d 1114, 126 A.L.R. 1278, 1281 (1940). Though a verdict may not be predicated on "mere conjecture or speculation," and when two opposite conclusions appear equally probable from all of the evidence neither of them can be said to have been proved, the fact that both theories are consistent with the evidentiary facts does not necessarily mean that they are equally probable. If it fairly appears that one is more probable than the other a jury may so conclude. Ogilvie v. Aetna L. Ins. Co., 189 Cal. 406, 209 P. 26, 26 A.L.R. 116, 120 (1922).

■ Though we might be inclined to suspect that the appellant himself started the motor, the jury was entitled to believe his testimony that he did not. Certainly Travis Coleman, the only person over 16 years old on the premises, did not do it, nor did Gary Thacker, who was working outside the building. Therefore, by process of elimination it had to be Larry Thacker or Dean Coleman, and which particular one of them it was makes no difference. The evidence was sufficient to support a finding that the accident was caused by one of the youthful interlopers.

■ There is no question but that the appellant was a "gratuitous licensee" on the premises as defined in § 331, Restatement of Torts. It was held in Kentucky & West Virginia Power Co. v. Stacy, 291 Ky. 325, 164 S.W.2d 537, 539, 170 A.L.R. 1 (1942), that to such a licensee the person in control of property owes "the duty of refraining from willfully or wantonly causing him injury or from committing active negligence resulting in his injury, and, if the harm caused to the gratuitous licensee is the result of a natural or artificial condition of the property, known to the possessor of the property and which he should realize involves an unreasonable risk to the licensee and has reason to believe that the licensee will not discover the condition or *realize the risk,* the possessor owes the licensee the duty to make the condition reasonably safe or to warn him of the condition and the risk involved therein." (Emphasis added.)

■ It is our opinion that the unsupervised presence of adolescent boys in a machine shop, especially boys known to be or likely to be experimenting or playing with machinery capable of inflicting injury, is equivalent to a dangerous condition and that with respect to a gratuitous licensee the person in control of the premises is negligent as a matter of law in permitting it if he has reason to believe the licensee "will not discover the condition or realize the risk." Cf. Restatement of Torts, § 342. If the 16-year old appellant had been a mature person we would have no hesitation in holding that Travis Coleman, the person in charge, had no reason to believe that he would not realize and appreciate the risk of injury from the negligence or horseplay of the other boys with the machinery. Certainly the appellant and Travis Coleman were equally cognizant of the *condition,* but the law does not presume that an immature person has the same capacity as an adult to appreciate the danger of a known condition. The jury has the right to judge the child's conduct by a lesser standard of care, i. e., "that which is usually exercised by persons of the same age, experience and intelligence under like or similar circumstances." Jones v. Kentucky Utilities Company, Ky., 334 S.W.2d 263, 265 (1960);[2] Blue Diamond Coal Company

---

2. We do not equate the obviousness of the danger in this case with that in the Jones case.

v. Bush, Ky., 342 S.W.2d 694 (1961). See also annotations, "Contributory Negligence of Children," 107 A.L.R. 4, 174 A.L.R. 1080, 1154, 77 A.L.R.2d 917. It is for that reason that we cannot say that the appellant was contributorily negligent or assumed the risk as a matter of law, or that Travis Coleman was non-negligent as a matter of law. It is our conclusion that it was for the jury to say whether a 16-year old boy who had been in the shop and done the same things without incident on numerous previous occasions should have appreciated the risk of injury from the misdoings of the other boys, and whether Travis Coleman had reason to believe that he would not appreciate it.

In a case of this nature it is not inappropriate to suggest that the policy of the law must be to discourage the unsupervised presence of irresponsible children and adolescents in premises where the risk of injury is unreasonable in comparison with the ease of opportunity on the part of the possessor to prevent it.

We hold that at the close of plaintiff's testimony there was sufficient evidence of negligence for submission of the case to the jury and that under this evidence it could not be said as a matter of law that appellant was contributorily negligent or had assumed the risk.

The judgment is reversed for a new trial.

MONTGOMERY and STEWART, JJ., dissenting.

STEWART, Judge (dissenting).

I dissent from the majority opinion upon the basis that the trial court was correct in holding as a matter of law: (a) Travis Coleman's status was that of independent contractor at the time of Gary Coleman's injury; and (b) the latter assumed the risk that resulted in his injury.

John Baker testified Travis Coleman and David Thacker, both former employees of his at the electric shop, signed contracts to do independent contractor work for him, before the time of the accident. Coleman testified that, as an employee of Baker, he had welded transformers and built charges; but it was only after he became an independent contractor that he began to construct motors.

The contract was made up in duplicate, with Baker signing and retaining one copy and Coleman signing and retaining the other. The contract provided for $1.00 per month rent; for parts to be furnished by Baker; for electricity, acetylene and oxygen to be furnished by Coleman. The payment for finished motors was to be $150 each, plus a rebate of $25 for electricity. The contract states:

"The party of the second part (Coleman) will furnish all labor needed in the manufacture and will also be responsible for any damages caused by his workers and for any accidents they may have or that outside persons may have on or about the premises."

The contract was for a term of two years and provided for renewals or termination upon 30 days' notice by either party.

In actual practice, Baker would advance money to Coleman and Thacker, (who also operated as an independent contractor, although he did not sign a contract until July, 1960) in the form of cash and payment of electricity and acetylene bills. The parties would make a final settlement when a machine was completed. Baker had no deduction for social security or income tax when he paid Coleman and Thacker.

Baker owned the building but did not own the lathes or other heavy machinery in the building.

Travis Coleman testified he was self-employed and had been since April, 1960. While he built motors for Baker, he also did work for other people and kept the money for himself. Coleman stated that he, and no one else, determined how many

hours per day he worked. Baker testified he came to the shop on an average of one day per week for a 10-minute visit, to tell the men when he had work for them and to see if they needed parts.

In Turner v. Lewis, Ky., 282 S.W.2d 624, this Court held that the right of control of work and the methods of its performance are determinative on the question of whether one is a servant or an independent contractor. Here Coleman absolutely controlled the work and the method of its performance. See also Marcum v. United States, 6 Cir., 324 F.2d 787, wherein it was said that, under Kentucky law, the test for determination of whether the alleged servant was an independent contractor rather than a servant in connection with the occurrence in issue is whether the master had the right to control the details of the work. The evidence shows that Baker was interested only in the results of the work, i. e. motors, not the details involving their fabrication.

In 27 Am.Jur., Independent Contractors, sec. 2, p. 481, an independent contractor is defined as " * * * one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work."

From any point of view, when the foregoing principles of law are applied to the evidence, in my opinion the trial judge had no alternative but to find that Coleman was an independent contractor.

It is also my view Gary Coleman, who was 16 and had finished the second year in high school, at the time he was injured should be held to the same standard of care as an adult, and that, taking all the factors into consideration in this case, he was properly found by the trial court to be guilty of contributory negligence as a matter of law.

In Wright v. O'Neal, Ky., 320 S.W.2d 606, a 14-year-old farm boy, who was experienced in driving tractors and had been specifically instructed by his employer as to the safe operation of such equipment while mowing on a hill, was killed when the tractor turned over on a hillside. This Court held the boy was contributorily negligent as a matter of law because he had failed to follow the instructions his employer had given him.

A 15-year-old high school student was determined contributorily negligent as a matter of law when he climbed up on the top of one of the sides of a bridge and came into contact with "live" electric wires suspended above him. This Court said in that case, Jones v. Kentucky Utilities Company, Ky., 334 S.W.2d 263: "The youth, James Lynn Jones, who was a high school student, will be deemed to have had sufficient knowledge and appreciation of the danger to himself in climbing and walking upon the top of the high superstructure of the bridge, sixty feet above the river, and to be chargeable with an awareness of danger from the close electric wires."

. In NACCA Law Journal, Vol. 30, p. 62, it is stated: "The favorable mutant laid down in Dellwo v. Pearson, 259 Minn. 452, 107 N.W.2d 859, holding infant drivers to an adult standard of conduct continues to grow in strength and compel adherence. See, e. g., Harrelson v. Whitehead, [236] Ark. [325], 365 S.W.2d 868; Allen v. Ellis, [191] Kans. [311], 380 P.2d 408; Nielson [Nielsen] v. Brown, [232] Ore. [426] 374 P.2d 896."

Gary Coleman testified in great detail about mine motors, their size, weight, method of operation, type of material, number of gears, etc. On the day of the accident, he went to the shop for the purpose of driving the motors. He had been doing this for three months, about three times a week. He operated the motors in the shop, on the road, or on a school yard near the shop.

On the day of the accident he drove the machine inside the shop for his own pleas-

ure. He knew the machine was 10 feet long, five or more feet wide and weighed several tons. He knew how to stop and start it and how to regulate its speed and change gears. He knew that (as he stated) "* * * if it got in motion it was subject to run over somebody unless it was being controlled."

Travis Coleman testified thus about the boy: "I told him if he didn't stay off it—I told the whole crowd, if the boys don't stay off-n it—you will get killed." He stated he gave this warning on the afternoon of the day the accident occurred.

Under the evidence, it is difficult for me to distinguish the case at bar, on the question of whether Gary Coleman could be held contributorily negligent, from the Wright and the Jones cases. Certainly, under the evidence introduced, he had "sufficient knowledge and appreciation of danger to himself" of driving the motor.

I would affirm the judgment.

I am authorized to state that MONTGOMERY, J., joins me in this dissent.