**PENN CENTRAL TRANSPORTATION COMPANY and Community Grain Company, Inc., Appellants,**

v.

**Coakley D. SKAGGS, Appellee.**

**Coakley D. SKAGGS, Cross-Appellant,**

v.

**PENN CENTRAL TRANSPORTATION COMPANY, Cross-Appellee.**

Court of Appeals of Kentucky.

Oct. 6, 1972.

Rehearing Denied Feb. 2, 1973.

Lively M. Wilson, Stites & McElwain, Galen J. White, Jr., R. Lee Blackwell, Tarrant, Combs, Blackwell & Bullitt, Louisville, for appellants and cross-appellees.

Frederick C. Dolt, Leibson, Dolt & McCarthy, James H. Polsgrove, Louisville, for appellee and cross-appellant.

PALMORE, Justice.

Penn Central Transportation Company (hereinafter Penn Central) furnished a

boxcar to Community Grain Company, Inc. (hereinafter Community) for the purpose of shipping grain. Community loaded it with corn and sent it to Schenley Distillers, Inc. (hereinafter Schenley). While unloading the car, Coakley D. Skaggs, an employe of Schenley, was injured. He sued Penn Central and Community on the theory that his injury resulted from a defective condition of the car. The jury returned a nine-man verdict for $95,000 assessed against the two defendants equally. While motions for judgment n. o. v. or new trial were pending Skaggs filed a remittitur of $20,000 and a substituted judgment for $75,000 was entered. (A combined trial order and judgment had been entered five days after the verdict.) All of the parties, including Skaggs, appeal from this judgment.

The alleged defect in the boxcar consisted of one or more large nails, spikes or bolts protruding from the floor. Skaggs and a fellow-employe named Myers were removing the loose corn by running heavy two-wheeled grain scoops along the floor under it. As Skaggs shoved his scoop under the corn it caught against one of these nails, spikes or bolts, causing him to be thrown forward and tumbled over the handle of the scoop. According to evidence which the jury was authorized to believe, he sustained a disc injury in the lumbar area of his spine and became disabled to the degree that in the absence of successful corrective surgery he never again could have engaged in heavy manual labor or strenuous physical activity. Eventual prospects of performing that surgery were frustrated by a gunshot wound which left him paralyzed from the neck down.

Each of the defendants, Penn Central and Community, contends that the evidence was not sufficient to support a verdict against it. They contend also that the instructions were erroneous, the amount of the verdict was excessive, and the trial court erred in excluding certain evidence bearing upon Skaggs' earning power.

For the reasons hereinafter stated we are of the opinion that the award must be set aside as excessive, but that there was no prejudicial error justifying a reversal on any other ground. Hence a new trial may be confined to the issue of damages.

■ Penn Central had the duty of exercising ordinary care to furnish the shipper, Community, a car that was in reasonably safe condition for its intended use. Louisville & N. R. Co. v. Powers, Ky., 255 S. W.2d 646 (1953). This duty extended to Community's consignee, Schenley, and Schenley's employe Skaggs. Louisville & N. R. Co. v. Freppon, 134 Ky. 650, 121 S.W. 454 (1909).

■ Community, the shipper, in undertaking to load the shipment had the duty of exercising ordinary care to do so in such a manner that employes of the consignee (or, for that matter, any other persons entitled to unload the car) exercising ordinary care for their own safety would not be injured in unloading the car. 13 Am.Jur.2d Carriers § 320; Annotation, "Shipper's liability to consignee or his employe injured while unloading car because of improper loading," 35 A.L.R.2d 609.

Our own research on the subject has not turned up any satisfactory discussion of what duties a shipper who loads the car owes toward those who unload it with respect to its physical condition. However, Community concedes that it had the duty of exercising ordinary care "to inspect and load the car," and in Louisville & N. R. Co. v. Powers, Ky., 255 S.W.2d 646, 649 (1953), it was held proper to submit (to the jury) the question of a shipper's negligence "concerning its inspection and loading" of defective freight cars. Until further enlightened, we assume that the general duty of ordinary care in safe loading embraces the specific duty of a reasonable inspection to discover and eliminate (or warn against) any physical defect in the car itself that presents a foreseeable cause of injury to persons unloading it in a normal and customary manner.

The sufficiency of the evidence, then, is to be weighed in terms of these duties.

The railroad car was inspected by Penn Central at Indianapolis, Indiana, on March 24, 1967, and delivered to Community at Edinburg, Indiana, on March 29, 1967. It was thereafter inspected by Community and loaded on April 11, 1967. The accident took place at Louisville, Kentucky, on April 17, 1967.

Evidence for Penn Central was that when its cars are returned from customers they frequently have nails and spikes which must be and are removed before the cars are sent out for use by other customers. All debris is picked up and the cars are thoroughly swept out. This procedure was followed with respect to the car in question.

Evidence for Community was that each car received for loading is carefully inspected, coopered and swept out. Holes through which grain may escape are patched with tin held in place by flat-headed roofing nails. No large nails or stud bolts are used. If nails, spikes or bolts are discovered in the floor they are driven in or cut off flush with the surface. Again, as in the instance of Penn Central, this procedure was followed with respect to the car in question.

■ "Reasonable probability is all that is required of evidence in order to support a [verdict]." Coleman v. Baker, Ky., 382 S.W.2d 843, 847–848 (1964). If it fairly appears that one theory is more probably correct than another, though both be consistent with the evidence, a jury may so conclude. Ibid.

Except for the testimony of a fellow-employe of Skaggs to the effect that the nails or spikes looked to him as though they had "worked up" through a seam in the floor, it is obvious that they were in place and protruding from the floor of the car when it left Edinburg for Louisville. Since there was no occasion for Community to use large nails or spikes, whereas they are frequently found in cars upon their return to Penn Central, it seems much more likely that those which caused the injury in this case were in the car before it was delivered to Community than it is that they were put in the car afterward.

■ On the evidence as a whole we are of the opinion that it was reasonable for the jury to conclude that the nails or spikes had been driven into the floor of the car as against the possibility that they had "worked up" through a seam. Once that conclusion is reached, it follows that they were there when the car left Edinburg. If Community's evidence is believed, they were not put there by Community. No one else had any reason to put them there while the car was at Community's siding. The greater probability is that they were there when Community received the car from Penn Central. If so, and if they were discoverable by the exercise of ordinary care on the part of either Penn Central or Community, then both Penn Central and Community were negligent, Penn Central because it failed to exercise ordinary care to furnish a car that was in reasonably safe condition for its intended use and Community because in loading the car without having discovered and eliminated the defect it concurred in exposing those who would eventually unload the car to an unreasonable risk of harm. We conclude that the evidence sustained a verdict against both defendants on this basis.

■ Penn Central argues that there is no evidence that it had any knowledge of the manner in which the car would be unloaded. The fact, however, that the railroad company has an established procedure for the discovery and removal of the very type of hazard that produced the injury to Skaggs is an implicit suggestion of its foreseeability. We do not hold that precautions actually taken by a party are to be regarded as a criterion of its duties. Cf. Hargadon v. Louisville & N. R. Co., Ky., 375 S.W.2d 834, 839 (1964); Louisville & N. R. Co. v. Stidham's Adm'x, 187 Ky.

139, 218 S.W. 460, 461 (1920). Nevertheless, there can be circumstances in which they have probative value. In this instance it seems to us that the practice of inspecting its cars for the purpose of discovering and removing obstructions and repairing defects including, specifically, nails and spikes left by previous customers is substantial evidence that the railroad company recognized and foresaw their potential danger to any person or persons who might enter and use the car for a legitimate purpose, including the process of unloading. Cf. Yeates v. Illinois Cent. R. Co., 241 Ill. 205, 89 N.E. 338, 341 (1909). Beyond that, regardless of whether Penn·Central knew exactly how the car was to be unloaded, the method used by Schenley surely was within the realm of what any railroad company should have anticipated.

■ Community contends there is no evidence that the nails or spikes were discoverable by a reasonable inspection on its part while the car was under its control. We have already indicated, of course, that there was enough evidence to support a finding that the car was in the same condition when it left Penn Central, hence when it left Community, as it was at the time of the accident. At that time the nails or spikes protruded upward from the floor to the extent that they caught against the grain scoop. Whether this condition was discoverable by a reasonable inspection was, in our opinion, a proper question for submission to the jury.

The jury was instructed that it was Penn Central's duty in furnishing a car to Community for the purpose of shipping grain to exercise ordinary care to have it in a safe condition for its intended use, and that this included the duty of making a reasonable inspection to discover foreign substances or objects, including projections on and above the floor, and the duty of removing or repairing any such as were discovered or in the exercise of ordinary care should have been discovered. Though it was unnecessary and inadvisable, we think,

for the instruction to specify the latter two means by which the company might have performed its basic duty of providing a safe car, cf. Croushorn Equipment C. v. Moore, Ky., 441 S.W.2d 111, 115 (1969), Penn Central does not object to this particular instruction, but complains of another instruction which is to the effect that if either of the defendants is found liable, so must the other. We shall reach that point presently.

The instruction covering Community's duties was that it had the duty of exercising ordinary care to determine that the car was in reasonably safe condition to be loaded with shelled corn for transportation, delivery and unloading at Schenley's and, in substance, that this included the same specific duties of inspection for and elimination of defects enumerated in the similar instruction relating to Penn Central.

Community objects to the instructions on the ground that they placed virtually the same duties on both defendants and for the further reason, as mentioned above with respect to Penn Central, that they required the jury to find against both if it found against either.

As related to this particular accident, which resulted from a defective condition making the car unsafe for unloading, the specific duty that was breached was in fact the same for both defendants. Each had the duty of exercising ordinary care to see that the car was in a reasonably safe condition for its intended use, which encompassed the eventual unloading of the commodity to be shipped.

■ At first blush it does seem anomalous to say that if either of two defendants whose culpability rests upon separate acts or omissions is found liable, so must the other. Yet upon closer scrutiny it makes sense in this case. Penn Central can be liable only if the defective condition existed when it delivered the car to Community, in which event Community (which, as we have stated, owed toward Skaggs the same

basic duty as did Penn Central) is necessarily liable for its failure to discover the defect and remedy it before loading the car. On the other hand, there being no evidence whatever that Community either created or discovered the defect while it had control of the car, the only basis for a finding of liability against it was that the defect was present when it received the car from Penn Central. Hence Community could not have been negligent except through its failure to discover a defect that existed by virtue of Penn Central's precedent negligence. So, any way it is viewed neither defendant could have been liable without the other's being liable as well.

■ The next argument is quite novel. It is that because Skaggs' earning power was destroyed by reason of a gunshot wound on January 1, 1969, the instructions should not have allowed any recovery for the diminution of his capacity to earn money beyond that time. Some courts have so held when the injured party dies from unrelated causes before the trial of his accident suit. The theory is that the fact of death overrides the life expectancy tables by eliminating any reason for using them. In other words, when an event has arrived there can no longer be any valid guess or forecast as to when it might arrive in the future. See, for example, Rogers v. Thompson, 364 Mo. 605, 265 S.W. 2d 282 (1954). This, of course, is not a case in which the plaintiff has died, if that makes any difference. Whether it does make a difference we need not decide. Suffice it to say that we are not persuaded that the principle contended for should be applied in this case. Suppose, for example, that tortfeasor A has inflicted a 50% permanent impairment on the claimant. Pending the trial of his case tortfeasor B inflicts upon him an injury that would have resulted in a 100% permanent impairment regardless of the previous injury caused by A. Yet when he suffered the second injury he was, economically speaking, only half a man. Hence there was

only half an economic life to be destroyed. In such a case A and B must share the cost equally. Certainly B should not bear it all. And so it is here. Penn Central and Community are liable for that portion of Skaggs' economic potential which was destroyed on April 17, 1967. If the second injury was tortious the second tortfeasor or tortfeasors are liable for the balance.

■ We pass now to the argument that the trial court erred in excluding evidence of Skaggs' record of numerous arrests and occasional convictions on various charges ranging from public drunkenness, disorderly conduct and speeding to contributing to the delinquency of a minor female, grand larceny, storehouse breaking and robbery between 1954 and 1968.

At the time of the accident Skaggs was 31 years old. He had a 10th grade education and was employed as a manual laborer. Incident to the evidence showing his physical condition preceding the accident it was disclosed that he coached a Little League baseball team and did such domestic chores as mowing the yard. This having displayed him in a virtuous light, says Penn Central, the door was opened for the defendants to elucidate the seamy side of his character. So far as we are concerned, there is no such door. Neither sweetness of character at home nor wenching and brawling abroad is a relevant consideration unless it bears upon the capacity to earn money. The latter aspect of this kind of testimony was considered in Empire Metal Corp. v. Wohlwender, Ky., 445 S.W.2d 685, 688 (1969), in which it was observed that although it is obvious that personal character and habits do have a bearing on earning capacity, a line of proscription must be drawn when the nature of the evidence is so degrading that it is likely to weigh more heavily against the person in question by reason of the ignominy and shame it reflects upon him than by virtue of its legitimate probative value. This is such a case.

It occurs to us that ordinarily the effect of a person's detrimental proclivities will

be reflected in his actual earnings and position in life. If Skaggs was in fact the kind of man indicated by the record sought to be introduced, no doubt that was a significant factor in his having to labor with his hands and back instead of holding some white-collar position with greater responsibility and more pay. It is our opinion that his current occupation and earnings were so far the best indication of his future earning capacity that it would have served no legitimate purpose to allow evidence discrediting his character.

We need not dwell on the manner in which the remittitur of $20,000 was brought about, because it is our opinion that even $75,000 would be an excessive recovery under the circumstances. The most favorable medical testimony for Skaggs was that of his physician, Dr. Robert F. Sexton, a neurological surgeon, who said that in his opinion a diseased condition of a disc in the lumbar segment of his spine was attributable to the accident of April 17, 1967, and would have completely disabled him for manual labor unless and until it was corrected by surgical excision of the disc. This type of operation is considered major surgery but ordinarily achieves a high degree of success. Dr. Sexton estimated that there would have been an 85% to 90% probability of Skaggs' being able to resume his normal activities had the surgery been performed, and it had been scheduled for January 12, 1969, if further examination at that time confirmed its necessity.

 Skaggs' life expectancy was 36.59 years. His earnings in 1966 were $4222.06. The pain and suffering occasioned by the disc injury will continue throughout his life, but except for the tragic event of January 1, 1969, there was an 85% to 90% probability not only that his earning capacity would have been fully restored, but also that his pain and suffering would have been eliminated or at least minimized. Penn Central and Community are not chargeable with the accident that destroyed

this prospect. Their liability must be assessed in terms of what appeared probable before Skaggs was shot. We cannot avoid the conclusion that $75,000 is grossly excessive compensation for a disc injury with an 85% to 90% chance of complete recovery through surgery. The rule in workmen's compensation cases that recovery is not barred by a claimant's refusal to undergo disc surgery, cf. Bethlehem Mines Corp. v. Hall, Ky., 379 S.W.2d 58 (1964), involves different considerations and does not in a tort case militate against considering the feasibility and probable success of such an operation as an important factor in determining the amount of loss reasonably attributable to the injury.

The judgment is affirmed in part and reversed in part with directions for a new trial limited to the amount of damages.

All concur.