Jeffrey SASSER, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013–SC–000697–MR

Supreme Court of Kentucky.

RENDERED: MARCH 17, 2016

COUNSEL FOR APPELLANT: Brandon Neil Jewell, Assistant Public Advocate, Department of Public Advocacy

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Micah Brandon Roberts, Assistant Attorney General

## MEMORANDUM OPINION
## OF THE COURT

A circuit court jury convicted Jeffrey Sasser of first-degree robbery, first-degree burglary, receiving a stolen firearm, and of being a first-degree Persistent–Felony Offender (PFO), for which the trial court entered judgment imposing a total effective sentence of 30 years' imprisonment. Specifically, Sasser was sentenced to 20 years' imprisonment for first-degree robbery, enhanced by his PFO status to 30 years; 20 years' imprisonment for first-degree burglary, enhanced by his PFO status to 30 years; and five years' imprisonment for receiving a stolen firearm, enhanced by his PFO status to 15 years; with all sentences to be served concurrently. Sasser appeals from this judgment as a matter of right.[1]

Sasser presents for our review three claims of error arising at trial: (1) that he was entitled to a directed verdict for the first-degree robbery and burglary charges; (2) that the trial court admitted improper character evidence against him; and (3) that he was entitled to a jury instruction for third-degree terroristic threatening as a lesser-included offense of the first-degree robbery charge. Because we find no merit in Sasser's claims of error, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sasser's criminal convictions arose from three separate incidents that occurred over

---

1. Ky.Const § 110(2)(b).

the period of three days. The first incident involved Jennifer McNew, who reported to law enforcement that her home had been invaded and that someone had stolen her .22 caliber firearm. This stolen firearm would play a critical role in the events occurring in the following days.

Three days after the invasion of McNew's home, former police officer John Duke answered a knock on his door at home. Cracking open the door, he met Sasser on his doorstep. Sasser began telling Duke that his granddaughter ran away and that he had been up all night searching for her. Duke engaged in a brief conversation with Sasser and offered to call the police for him but Sasser refused. Sasser turned to walk away but abruptly turned around, pointed a gun toward Duke's face and demanded, "What do I need to do to get you to open the door and let me in there?" Duke slammed the door, retrieved his own firearm, and immediately called 911. After arming himself, Duke went outside to look for Sasser but Sasser had fled.

That same day, Tina Frye returned to her home and discovered that it had been ransacked, with various items missing, including a dagger, a can of coffee, two hats, a leather piece for a belt, and a pillowcase. Frye promptly informed law enforcement of the break-in.

Shortly thereafter, Constable Tim May was patrolling the area looking for the man who pulled the gun on Duke. He spotted a man matching the man Duke described. As May approached the man, he dropped a bag and took off running. May apprehended Sasser and discovered that he was in possession of a revolver. This revolver matched the .22 caliber firearm that had been stolen from McNew's home. Frye also later identified items recovered from Sasser that matched those missing from her home.

After his arrest, Sasser was interviewed by Detective Charles Loomis. Sasser admitted that he had gone into Frye's house to get some food, but he believed the home belonged to a friend of his named "Hippie." Sasser also stated that he did not bring the firearm into Frye's home but, instead, left it in the woods to retrieve after leaving. As for Duke, Sasser said that he went to Duke's home with the intent to get money. Had he been able to get inside Duke's home, he planned to take money from him.

## II. ANALYSIS

### A. Sasser's Motions for Directed Verdicts.

▪■■ In his first claim of error, he asserts that the trial court erroneously denied his motions for a directed verdict with respect to the first-degree robbery and first-degree burglary charges. Essentially, Sasser argues that the Commonwealth did not adequately prove all of the elements of each of these offenses. In deciding whether to grant a directed verdict, a trial court "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). We review Sasser's arguments in light of that standard.

#### 1. First–Degree Robbery.

■ Sasser's first-degree robbery charge stems from his encounter with Duke. Sasser argues he was entitled to a directed verdict acquitting him of the charge because the Commonwealth's evidence does not sufficiently prove the existence of a theft or an attempted theft when

he attempted to force his way into Duke's home with a firearm. The Kentucky Revised Statutes (KRS) define first-degree robbery as follows:

(1) A person is guilty of robbery in the first degree when, in the course of committing a theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:

(a) Causes physical injury to any person who is not a participant in the crime; or:

(b) Is armed with a deadly weapon; or

(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.[2]

In light of the statute, Sasser argues it was unreasonable for the jury to conclude he was "in the course of committing a theft" when he threatened Duke with the firearm. We disagree.

■ This aspect of the robbery statute may be established either by evidence of a completed theft or an attempted theft.[3] It is undisputed that a completed theft did not occur, so we need only analyze whether the jury could have reasonably determined that Sasser was attempting a theft that morning outside Duke's front door. KRS 506.010 defines *criminal attempt as* when someone "[i]ntentionally does or omits to do anything which, under the circumstances as he believes them to be, is a *substantial step* in a course of conduct planned to culminate in his commission of the crime."[4]

The crux of Sasser's argument is that because he never apprised Duke of any intention to deprive him of his property, there was no substantial step in committing a theft. Sasser claims this was underscored by the fact that he did not physically force his way into the home, nor did he demand any money from Duke. But, in presenting this argument, Sasser omits discussing his own admitted state of mind. He went to Duke's home for the purpose of depriving Duke of his property. He told law enforcement that had he gained entry to Duke's home, he would have taken any money he could have obtained and run. The jury heard evidence that Sasser admitted he approached the Duke home intending to commit a theft. The substantial step necessary for an attempted theft occurred when Sasser pointed his firearm at Duke and demanded entry into his home with the simultaneous subjective intent to take any money he could obtain and flee with it.

Sasser urges us to conclude that this action cannot represent a substantial step in committing first-degree robbery because there was no overt indication that Sasser's goal was theft. This ignores the mindset he readily admitted to law enforcement. And brandishing a firearm in Duke's face can only be viewed as a physical act performed in furtherance of Sasser's goal of robbing Duke. It is reasonable for a jury to find that his subjective criminal intent combined with the threat of deadly force amounted to an attempted theft that morning in front of Duke's home. Because the jury's verdict was not clearly unreasonable, Sasser was not entitled to a directed verdict.

*2. First–Degree Burglary.*

---

**2.** KRS 515.020.

**3.** *See Travis v. Commonwealth,* 327 S.W.3d 456, 460 (Ky. 2010).

**4.** Emphasis added.

Sasser also claims that he was entitled to a directed verdict on first-degree burglary arising out of the incident at the Frye residence the same day as his encounter with Duke.[5] KRS 511.020 defines first-degree burglary as follows:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

The Commonwealth predicated the first-degree burglary charge upon subsection (a), alleging that Sasser armed himself with a deadly weapon "while ... in the immediate flight" from the Frye dwelling. Based upon the *Benham* and *Fletcher* standards cited above, we are constrained to conclude that the evidence presented in support of the Commonwealth's theory falls well short of the mark required to overcome a motion for a directed verdict.

The only evidence relevant to this factual issue came from the testimony of police detective Charlie Loomis, who paraphrased what Sasser had told him during a post-arrest interview. According to Loomis, Sasser said that before going into the Frye residence, he "left [his gun] outside, that he hid or left it outside in the woods and ... he got it and [pause] he retrieved it when he got out and left with it." Nothing else in the evidentiary record connects a firearm to the Frye burglary. The Commonwealth contends that this evidence was sufficient to establish that Sasser was armed while in his immediate flight from the building. We disagree.[6]

We have never undertaken to fully define the temporal and spatial limits and other relevant factors that determine what events fall within the range of "immediate flight," as used in the burglary statute. However, a full analysis of the matter would have no effect on our decision in this case. Regardless of how we might ultimately construe the meaning of "immediate flight," applying any standard would not be possible without evidence to indicate where "outside in the woods" was in relation to the Frye residence, when in relation to exiting the Frye residence Sasser became armed, or, using the interpretation advanced in Justice Wright's separate concurring opinion, whether Sasser's getaway from the crime scene was complete or ongoing when he reached the gun and armed himself. From the dearth of evidence available here, the jury could only speculate or guess. It is axiomatic that "a verdict may not be predicated on 'mere conjecture or speculation[.]' "[7]

---

5. It should be noted that the trial court also gave an instruction on second-degree burglary, which the jury rejected. 6

6. Our review of this issue is somewhat hampered by a trial record devoid of the parties' directed verdict and jury instruction arguments. Inaudible bench conferences and off-the-record proceedings in chambers deprive us of the ability to review and better understand the arguments made to the trial court and the trial judge's rulings, or even if the issues were properly preserved at all. Nevertheless, evidence presented was clearly recorded and preserved, so our ability to review the evidence for directed verdict purposes is not affected.

7. *Coleman v. Baker*, 382 S.W.2d 843, 848 (Ky. 1964).

The real harm in the Commonwealth's position is that it shifts to the defendant the burden of proof on an essential element of the crime, and relieves the Commonwealth of its constitutional responsibility to prove each element of the crime beyond a reasonable doubt.[8] Viewed in its entirety and construed in the light most favorable to the Commonwealth, the evidence presented in this case comes nowhere close to showing that Sasser was armed while "in the immediate flight" from the Frye residence. Consequently, we reverse Sasser's first-degree burglary conviction.

## B. There Was No Improper Character Evidence Introduced against Sasser at Trial.

◼ At trial, Detective Loomis was called to testify about his interview with Sasser shortly after his arrest. Detective Loomis recalled asking Sasser why he left his gun outside before entering Frye's home. Detective Loomis testified that Sasser responded that he "knew the difference between first and second-degree burglary" and that Sasser intentionally left the firearm outside to avoid the first-degree burglary charge.

Sasser claims that this testimony was erroneously admitted as character evidence introduced through extrinsic evidence of prior bad acts. He also suggests that the evidence is not relevant; and, alternatively, if relevant, the probative value of the testimony is substantially outweighed by the risk of prejudice to Sasser. To reverse the trial court's decision to admit the evidence, we must find that the trial judge abused his discretion.[9] Because we find no such abuse occurred, we disagree.

We start with relevance. The Kentucky Rules of Evidence (KRE) state that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [10] Sasser claims that inclusion of his knowledge regarding the specific burglary classifications under Kentucky law is irrelevant to proving any material fact in this case. But this ignores the reality that the information in this testimony points to Sasser's mental state when he entered Frye's home. This is evidence of purposeful conduct, tending to prove that Sasser intended to burglarize Frye's home under a lesser charge. Moreover, as we discussed at great length above, Sasser's status as an "armed perpetrator" is a critical component to his conviction for first-degree burglary. This evidence establishes his motivations with regard to the location of the firearm in relation to the scene of the crime. Although we ultimately determined Sasser's efforts to be futile, this knowledge extends to his overall goals in perpetrating the burglary and his attempts to evade criminal liability. Therefore, the evidence was relevant.

As for Sasser's character-evidence argument, KRE 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a

---

8. "[T]he burden is on the government in a criminal case to prove every element of the charged offense beyond a reasonable doubt and that the failure to do so is an error of Constitutional magnitude." *Luna v. Commonwealth*, 460 S.W.3d 851, 885 n. 88 (Ky. 2015) (quoting *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002)).

9. *See Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (reversal for an abuse of discretion is warranted when the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles").

10. KRE 401.

person in order to show action in conformity therewith." Sasser argues that his statements made to Detective Loomis fall within this prohibition. Sasser argues that a person with his background would only know the difference between first and second-degree burglary because he has a criminal history. So he ultimately claims that allowing the jury to hear this testimony is improper character evidence proved by his prior bad acts. This is mistaken.

There is no evidence of any specific crimes, wrongs, or acts presented in Detective Loomis's testimony. Perhaps if the interview with Sasser continued, with Loomis asking Sasser *how* he knew the difference between the two offenses, Sasser's answer to the question would be problematic. Absent this additional information, all that remains is innuendo that Sasser suggests can point only to a criminal background. But we are not persuaded that this conclusion by jurors inevitably follows. Regardless, this is not evidence of Sasser's "bad acts." So we will not consider this inadmissible character evidence under KRE 404(b).

Finally, Sasser argues that even if this testimony is relevant and otherwise admissible, the trial court should have nonetheless excluded the testimony under the KRE 403 balancing test. Relevant evidence may be excluded under our evidentiary rules if "its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[11] Here, there is great probative value in Detective Loomis's testimony because it provides insight into Sasser's mental state at the time he broke into Frye's home. This value cannot be "substantially outweighed" by a prejudicial impact that is dependent on speculative innuendo to come to fruition. We simply cannot conclude that the KRE 403 balancing test requires exclusion of Detective Loomis's testimony.

Because the inclusion of this testimony is consistent with the Kentucky Rules of Evidence, the trial court did not abuse its discretion in admitting it at trial.

### C. Sasser Was Not Entitled to an Instruction for Third–Degree Terroristic Threatening.

As a final claim of error at trial, Sasser argues that as a result of his contact with Duke, he was entitled to a jury instruction of third-degree terroristic threatening as a lesser-included offense to first-degree robbery. A person is guilty of third-degree terroristic threatening under Kentucky law if he "threatens to commit any crime likely to result in death or serious physical injury to another person or likely to result in substantial property damage to another person."[12] Sasser specifically argues that if the jury was not convinced that he was in the process of "committing a theft," which is necessary to convict for first-degree robbery, it could have found him guilty of this lesser offense of merely threatening physical harm to Duke.

Sasser is correct in informing us that a trial judge must give instructions on any lesser-included offenses supported by the evidence.[13] A lesser-included offense is "established by proof of the same or less than all the facts required to establish the commission of the offense

11. KRE 403.

12. KRS 508.080(1)(a).

13. *See Swain v. Commonwealth*, 887 S.W.2d 346, 348 (Ky. 1994).

charged[.]"[14] The Commonwealth rightly points out that "if the lesser offense requires proof of a fact not required to prove the greater offense, then the lesser offense is not included in the greater offense, but is simply a separate, uncharged offense."[15] We review a trial court's ruling on jury instructions for abuse of discretion.[16]

As we discussed above, first-degree robbery may be accomplished by way of a threat of deadly force. But this is not the only way one may be convicted of that offense. In addition to threatening harm, a person may be found guilty of the offense by either causing physical injury to someone other than a participant in the crime, or by simply possessing a deadly weapon.[17] First-degree robbery does not require proof of a threat; a threat is just one of many ways one may be convicted of this offense. A conviction for first-degree robbery does not require proof of a threat to obtain a conviction. So we hold that third-degree terroristic threatening is a lesser, uncharged offense rather than a lesser-included offense.

We conclude that the trial court's decision was reasonable and supported by sound legal principles. The trial court did not abuse its discretion by refusing to instruct the jury on third-degree terroristic threatening.

## III. CONCLUSION

For the foregoing reasons, we reverse Sasser's first-degree burglary conviction and the sentence imposed therefor. In all other respects, the judgment of the trial court is affirmed.

---

14. KRS 505.020(2)(a).

15. *Colwell v. Commonwealth,* 37 S.W.3d 721, 726 (Ky. 2000).

All sitting. Cunningham, Hughes, Noble, Venters, and Wright, JJ., concur. Wright, J., concurs with separate opinion in which Noble, J., joins. Minton, C.J., concurs in part and dissents in part by separate opinion in which Keller, J., joins.

WRIGHT, J., CONCURRING:

While I concur with the majority's well-reasoned opinion, I write separately as I would go further and set out the parameters for what constitutes "immediate flight." In my view, immediate flight is neither a product of either distance or time. Rather, it is wholly dependent upon the stage of the attempted escape.

The "immediate" flight, or first stage, constitutes divorcing oneself from pursuit or the possibility of observation that would connect the individual to the crime while fleeing the scene. The second stage would be a general retiring action. The stage of flight varies from one case to the next and is a fact-driven determination. Immediate flight could be only a few seconds and a few feet or could cover a distance of miles over the course of minutes or even hours in the event of pursuit from the crime scene. For example, if a perpetrator was being pursued over a period of time and space (regardless of the specific amount of either) and stopped at some point during the pursuit to retrieve a stashed weapon, he was still in "immediate flight."

Those, however, are not the facts here. Appellant's statement to the police was that he left the gun in the woods so that if he were caught, he would be charged with second-degree burglary rather than first-degree. The difference between second-degree burglary and first-degree is whether a perpetrator is armed during the crime

---

16. *Tunstull v. Commonwealth,* 337 S.W.3d 576, 583 (Ky. 2011).

17. KRS 515.020.

or in immediate flight therefrom. Obviously, Appellant, who was the only witness, thought the gun was beyond the area of immediate flight from the crime scene. As there were no witnesses to the crime, we have to rely upon Appellant's admissions. The Commonwealth failed to put forth any evidence of distance or visibility from the crime scene. In the case at bar, once Appellant reached the woods, there was a physical barrier constituting a break from the crime scene. At that point, he felt he was out of danger of immediate pursuit or observation. Thus, the initial stage, or "immediate flight" had ended prior to Appellant retrieving the gun.

Furthermore, the legislative purpose in specifying "immediate flight" is to reduce the danger to the public. Appellant testified that he knew the difference between first- and second-degree burglary and that was the reason he left the gun in the woods. If we fail to recognize this break from the crime scene, the incentive for the reduction of danger in a future crime is lost. We are naive if we believe criminals do not converse with one another. Appellant would pass his story along to fellow convicts and future robbers would realize they have no incentive to create a safer environment during the commission of their crimes.

Noble, J., joins.

Minton, C.J., CONCURRING IN PART AND DISSENTING IN PART:

I respectfully dissent. Though I join the majority in its resolution of Sasser's robbery conviction, I must depart from its analysis in granting him a directed verdict for first-degree burglary. Sasser was not entitled to a directed verdict on that charge because the Commonwealth presented sufficient evidence in what is a sparse record that Sasser armed himself with a deadly weapon while in *immediate flight* from the Frye building—or at least enough evidence to allow the jury determine his guilt.

To begin, I would like to remind my colleagues in the majority of the high evidentiary burden for rejecting a trial court's denial of a directed verdict. To be sure, we only do so when, in light of the evidence as a whole, it would be *clearly unreasonable* for a jury to find guilt.[18] And a criminal defendant is not entitled to a directed verdict dismissing the charge.[19] Further showcasing the presumption favoring the trial court, all evidence is construed in a light most favorable to the Commonwealth.[20]

Before even reaching the statutory and evidentiary question of whether the Commonwealth satisfied its burden of proof, the poor quality of the record alone may warrant affirming the trial court's denial. Whatever arguments were made regarding jury instructions or as part of a motion for directed verdict eludes this Court's review. I am left to presume the directed-verdict issue was preserved at all—let alone the troubling task of divining any arguments raised or the basis of the trial court's decision to deny Sasser a directed verdict. All we do know is that the jury was also instructed on second-degree burglary; a charge it unanimously rejected.

But preservation aside, in giving effect to the ordinary meaning of the burglary statute, there is sufficient evidence to take the charge to the jury. The "immediate

---

**18.** *See Commonwealth v. Fletcher,* 59 S.W.3d 920, 921 (Ky. 2001).

**19.** *Commonwealth v. Benham,* 816 S.W.2d 186, 187–88 (Ky. 1991).

**20.** *See Commonwealth v. Jones,* 283 S.W.3d 665, 668 (Ky. 2009); *see also Commonwealth v. Sawhill,* 660 S.W.2d 3, 4 (Ky. 1983).

flight" inquiry has proven to be elusive to this Court over the years. But the express language of the statute clearly expands the definition of first-degree burglary well beyond the physical location of the theft—the deadly weapon may bear no relation to the building or theft whatsoever. Indeed, in *Baker v. Commonwealth,* we held that "if a burglar arms himself at *any time* within the immediate flight from the dwelling[,] he may be convicted of first-degree burglary."[21] A fleeing burglar seeking to avoid capture could potentially arm himself at any point during the pursuit, increasing the risk of death or serious injury to pursuers, as well as any bystanders. The post-theft action codified in the statute's text applies to this precise type of activity, and the statute makes clear that acquiring a deadly weapon when fleeing from a burglary is an aggravating circumstance worthy of a heightened offense.

So the critical inquiry for this issue is whether the Commonwealth presented sufficient evidence of Sasser arming himself in his immediate flight from the Frye residence. It is Sasser's own account, presented through Officer Loomis at trial, that he left his firearm in the woods just outside Frye's home, and retrieved it as he left the property. Essentially, Sasser admitted to arming himself in his immediate flight from the building, under a misguided notion that first-degree burglary can only occur inside the residence. My colleagues in the majority are disappointed by the lack of extensive inculpating Sasser of this offense. And no doubt, I too would prefer a more robust record of evidence the Commonwealth employed in making its case. But I cannot say that the defendant's own testimony that he retrieved the gun when he fled the building—testimony that is undisputed—fails to meet the evidentiary threshold to support of the charge. This testimony does more than raise an inference—it borders on confession.

This Court's understanding of "immediate flight" under the first-degree burglary statute continues to baffle us, and we are no closer to a judicially-manageable understanding. But while the text is pesky, we cannot ignore its reach, nor can we ignore the testimonial evidence inculpating Sasser of this offense. The majority became so distracted by how to prove immediate flight that it could not see the forest for the trees; it neglects the near-confession from Sasser that supports the charge. We can question whether the jury *should* have convicted Sasser under these circumstances. But it is not our place to disrupt its verdict when the Commonwealth meets its evidentiary burden—no matter how narrowly it does so.

I dissent.

Keller, J., joins.

---

21.  860 S.W.2d 760, 762 (Ky. 1993)(emphasis added).